The next case is Carl Zeiss v. Topcon Medical Systems, Appeal Number 21-1839. Mr. Carlson, before we start your clock running, can I just confirm, your co-counsel on the video screen is here to answer his client-specific questions. But if we don't have any client-specific questions, you're just going to have all the time? Or does he want to use his minute for something special? First, if there's no client-specific questions, I would use three minutes, if that's OK with you. OK, is that right, Mr. Miller? Yes, it is, Your Honor. OK, thanks. And when you're ready, Mr. Carlson. Good morning, and may it please the Court. The injunction in this case should be vacated. There should be no question that the injunction should be limited to enjoining Topcon from selling its product, Glaucoma Modulin. The clarity for this comes right out of the briefing. Zeiss, in its revised reply brief, said, quote, this motion is about Glaucoma Modulin, period plus quote, APPX 2783. The Court seized upon that statement and said in its order, quote, in its revised reply, Zeiss and I now limits the proposed injunction to Glaucoma Modulin specifically, period plus quote, APPX 7, footnote 6. So it should be no question that Glaucoma Modulin is a product enjoined. That's what's stated in Clause 1 of the injunction. Can I ask you just a clarifying factual question to make sure I understand? So the Glaucoma Modulin, that includes the super norm. Correct. But it doesn't include the Harmony Decoder Project. Correct. OK, just wanted to make sure I understood that. And so despite the clarity, we're here. Zeiss has seized upon overbroad statements in the text of the order itself, and seized upon mistakes in the body of the order, and has now actually moved for contempt of court to try to hold a different product, to hold top-down contempt of court for selling a different product that's Harmony, along with the DICOM decoder. Can I ask a question? What is the status of that motion for contempt? That's still pending, Your Honor. We've informed the court about this appeal. And we think perhaps the court may have tabled that motion pending resolution of this appeal. We don't know. But we have informed the district court about this appeal. On the injunction in Paragraph 2, if the injunction were modified to include an appendix with a list of the trade secrets, would that address your concerns? If there had been proceedings to establish that each of those trade secrets, or some subset of those trade secrets, warranted trade secret status, that it was not generally known in the art, that there was reasonable secrecy, et cetera, then there might be a record upon which to base that expanded injunction. However, the injunction itself needs to be coterminous with what was argued and what was supported in evidence. And one thing in particular. Does it make a difference that it's a preliminary injunction? Well, indeed, here's an important point, Your Honor. With respect to the irreparable harm section of the briefing, in the original brief, in the reply brief, et cetera, Zeiss's motion was expressly limited to Glaucoma module. And the reason for that is that Glaucoma module was about to be released in mid-2020. And so the irreparable harm was argued to be on the basis of this imminent release of this competing product. Now, Harmony, by contrast, is already out there in the market. In fact, Harmony was based on an earlier product called Synergy, an earlier product called iRoot. And that was out there long before Mr. Kurtzke arrived. So to try to somehow craft this injunction in a way that would ensnare or encompass Harmony, that strains the facts. It doesn't fit. What if paragraph two are modified to remove the language, NECZMI, confidential proprietary or trade secret information, including? So then it would just be directed to preventing use or obtaining, retaining, et cetera, of files obtained from the hard drive. Well, thank you, Your Honor. One point from the case, I'll refer to the Reno Air case cited by plaintiffs. When the injunction itself is not clear and doesn't say what the trade secrets are, what the confidential information is, it must be vacated. That's also. I'm asking you, if that language was changed, would that satisfy your concerns? I was not clear. I want to make sure I'm very clear. And I want to know if it would satisfy your concerns. It sounds like you're saying maybe it's still too vague. Well, and I think so, yes, Your Honor. And let me cite the Schmidt v. Lesser case in the Supreme Court. A point of Rule 65d in the specificity requirement therein is to allow meaningful appellate relief. And when it's unclear from the text of the injunction what was meant to be enjoined, the job of the appellate court is to remand it for clarity from the district court, for its own fact-finding, its own crafting of the injunction. I understand what you're saying. I'm not suggesting I'm changing it. I'm asking you a hypothetical question, that if the injunction had said what I said, would that be sufficiently clear? It's talking about you're enjoining from obtaining, retaining, using, transmitting, et cetera, et cetera, files obtained from the hard drive during the course of former defendant's employment. It is, Your Honor. And that's exactly what we're doing. We've actually engaged forensic firm Parole. And they are purging any such information from the Top Gun system. So your answer is yes, that would be clear. Yes, that would be clear. All right. So the injunction itself does not specify the trade secrets. Nowhere in the text of the order does it mention a trade secret, neither in the injunction itself, nor in the body of the order. The trade secrets are hardly a focus of the proceedings. The opening brief referenced the list of 115 trade secrets. The subsequent brief in the high-water mark is that there's some thumbnail sketches of buckets of trade secrets, dozens per bucket, schematics, source code, marketing lists, et cetera. But there's no particular recitation of the trade secrets. Refer to the Reno Air case. That's at 452 of 3rd 11.6. That's 10.1133. That's the Ninth Circuit saying that when there is no recitation of a particular IP, that's the focus of the injunction. That injunction's overbroad, fails the specificity requirements, and must be remanded. Was it clear from the briefing below which trade secrets were being asserted? Like, for example, there are some things that are identified starting at page A3282. Does that identify during the hearing? It was. Well, there was no hearing. It was on the papers. So it was in the record. Clearly, there's a list appended in the body of the briefing submitted to the court in the declarations. But in terms of focusing on any particular trade secret and trying to satisfy whether that met the legal status of being a trade secret, whether there was reasonable security appended to that trade secret, that was never litigated. And so the answer is no. And the test is whether or not it was. For Rule 65, you cannot refer to an external document. It's got to be within the four corners of the injunction to satisfy the specificity requirements. And it's also got to be understood by the perspective of a lay person. Now, the trade secret list itself has been shared per protective order with certain members of the internal TopCon legal department. But the engineers, the people who designed the products, they can't see that. And so for TopCon to be able to understand how to comply with that order that references a list that they can't even see, that really strains the bounds of Rule 65. So far better would be for the court to have articulated particular trade secrets that it had evaluated. And at that point, perhaps at that point, then that might be a sufficient injunction under Rule 65d. Now, the problem in this case is compounded by admitted, as I think we'll admit, there's fundamental mistakes in the body of the order. Now, they refer to it as a mere typographical error. It's not a typo. It's a fundamental misunderstanding of fact as to what was in front of the court. And this relates to a particular exhibit named Elman Exhibit 4. Elman Exhibit 4 relates only to OCT data, that's Optical Coherence Tomography data, for use in Harmony. Elman Exhibit 4 has nothing to do with HFA data. It has nothing to do with Glaucoma module. And in its briefing, Zeis, as it laid out its case about misappropriation related to HFA data, related to Glaucoma module, it interwove Elman Exhibit 4. And the court picked up on that. In its own order, giving its explanation of why it's reasoning as to why it's enjoining Glaucoma module because of alleged misconduct related to HFA files, in the middle of a paragraph that relates to HFA files expressly, the court pivoted and relied on Elman Exhibit 4. With no recognition that Elman Exhibit 4 related to a different set of data and a different product, nonetheless, the court relied on that to anchor its finding that HFA data had been misappropriated and that Glaucoma module should be enjoined. And that other data, are you able, under the confidentiality, to say what that is or? Well, yes. I mean, the other data is the OCT data. Okay. I just didn't want to say it if I couldn't. Right. And so, in your view, that shows that the court misunderstood. But you're not really challenging whether an injunction should have been granted at all. It's a little odd to me, to be honest, that you're not challenging the injunction. Instead, you're just scoping, you're challenging the scope of the injunction. And that's exactly correct, Your Honor. We don't, we're not contesting at this point the injunction against Glaucoma module. We stopped selling it at large expense in disruption to the client. We're not contesting that. So, we took Glaucoma module off the market. The problem is, this injunction is crafted, it casts a shadow over a completely different product that, yes, top cons continue to sell. And that's why Zeiss has moved it for contempt of court, because we're selling this other product. And that's exactly what Rule 65 is meant to prohibit in the Schmidt v. Lesser case. This cloud of contempt that arises from an interpretation in an order that's vague, that can't be reasonably understood. That's the whole point of Rule 65D and why that specificity must be reinforced. So, is there something beyond the Glaucoma module part of the injunction, the number one thing? Is there something left that you think there's, that you would agree to being enjoined, that this is just too broad? Was there some use of the, what is it, the HFA data to do something with Harmony and not just the Glaucoma module? So, the HFA data that was the focus of the allegations, those were being provided to a third-party developer named Calci that was, what they were trying to do was basically like an OCR, trying to read the numerical values off the PDF sheets of these HFA reports. And that OCRing, that processing of these PDF files, that was specific for SuperNorm, which is the module used within Glaucoma module. So, that injunction related to this alleged misconduct relates specifically only to Glaucoma module. And so, the concern is that by talking about HFA data, that using evidence that was actually OCT data, that the judge was actually arguing that the Harmony decoder project is at issue. I think it can be read that way. Okay. It can be read that way, and we saw that. We said, wow, we need to clean this up. And we tried to resolve it with ZEISS, but instead they're digging in and looking for a conductive court because we are selling that DICOM decoder for use in Harmony. Yes, we're still selling that. Okay. See, we're well into my rebuttal time, so I'll reserve what I can. Okay. Thank you. Good morning, Your Honors. May it please the court, Jeremy Elman from Allen Overy for appellee Carl Zeiss, Meditech, Inc. So, what are we arguing about today? Defendants present a very narrow challenge to a portion of the district court's order. Like the court just asked, Mr. Carlson said that he would accept maybe the hard drive and that he read the order expansively to potentially include the DICOM decoder. So, we asked, why are we here? What are we arguing about? And Judge Stoll said, what, you know, you didn't challenge the whole injunction, you're just challenging a very narrow portion. So, Zeiss very much agrees that it's a very narrow issue that we're considering today. Defendants assert that Clause 2 of the injunction is not specific and should be set aside under Rule 65D. Under a controlling Ninth Circuit law, unless TopCon can show that Clause 2 is so vague that there's no reasonably specific meaning. Can you just get right to it? What is Clause 2 supposed to address that Clause 1 doesn't? Clause 2 has the hard drive and all the files obtained during the course of employment with Zeiss. What else? Now, here's my specific question. Are there things beyond what's on the hard drive? So, there's the hard drive, which has 35,000 files. There's the files that the employees took. And then there's anything else that's been derived from that, like the product that they're trying to keep on the market. So, it's your view that Paragraph 2 does cover the Harmony decoder project? Yes, absolutely. That's what I was asking. That's absolutely right. Not what the secrets are. I get what the secrets are. Yes. So, your view is those secrets led to something in Harmony. Absolutely. Not all of Harmony. Not all of Harmony, correct. That is the database management platform, correct. But the decoder is to decode Zeiss's confidential OCT data. Zeiss is the only party... I'm sorry, you're on. Go ahead. I mean, I'll ask my question. Zeiss is the only party that can decode Zeiss OCT data. This decoder decodes Zeiss OCT data. And the only way that TopCon was able to do it, the reason why I brought this case, is because a bunch of employees took files from Zeiss to develop things like the decoder as well as the HFA extractor. So, there's multiple projects going on. There's a Zeiss RIP project at TopCon. Let me ask my question. Mr. Carlson said that your original motion for preliminary injunction was limited to the Glaucoma module.  That's absolutely incorrect. Can you tell me where that would be? In Appendix 7, we asked for three different types of relief. One of them was to prevent the release of Glaucoma module, which hadn't been released yet. But the first two clauses asked for a forensic examination of all the other files that were taken by the former employees and asking them to stop using it and to return it. So, if you look at Appendix 7, we asked for three different things. This is the court's order. This is the court's order, right. Court's order, Appendix 7. I'm happy to read it to you. But we asked for three different types of relief. The court granted our relief in full. So, what Clause 2 is about is the court's granting all our relief. All of the files that were taken from Zeiss that went to TopCon, all of those are part of the injunction. And the court actually mentions that in various places in her order. If you look at Appendix 15, Appendix 16, Appendix 18, there are various findings by the district judge where she found that the former employees took various types of business information, financial information, marketing information. So, all of that is also part of Clause 2, as well as there's a specific finding that the defendants took both HFA and OCT files. So, there's no dispute, and I'm happy to read it to you in Appendix 16. So, we think it's clear that Clause 2 is broader and intentionally broader by the district court. It's any CZMI information that's confidential, proprietary, or trade secret. So, it's not just about trade secrets. Mr. Carlson, they raised an interesting issue, which was how are they supposed to share with their engineers what it is that they can't do, even if there was some sort of appendix attached to the injunction that identified the trade secrets. How would that work? We think it's very simple. Any ZEISS information is not allowed to be a top copy. And so, these engineers are people who work on products. So, anything that's labeled ZEISS, any sort of ZEISS information that the former employees obtained is within the scope of Clause 2. Why then wouldn't Clause 2 be okay if it just referred to the hard drives, it's plural, of former employees? Well, it's hard drives. It's also emails that they took. So, if it's hard drives and it's also files that were taken by the employees during the course of employment with ZEISS, that would be okay for that to be a part of it. But what about things that they're deriving from those files, like the decoder, that they're using OCT data from ZEISS and then they're developing something else? TopCon has tried to make the argument that if they take ZEISS' information and develop something else, then they're allowed to use it, if they keep going. When you say ZEISS data, do you mean ZEISS data that they took in the hard drives or they took stuff and they have the knowledge and they're now getting the OCT data from their customers and stuff that's ZEISS data in a certain sense, but it's not the data that was taken by the employees? Only from ZEISS. Only ZEISS data. So, ZEISS has the data. If it's data from a customer, if it's something that's available to TopCon otherwise, then that's not ZEISS confidential data. Even if it's from a ZEISS machine, that's not what you're referring to? That's correct, Your Honor. Yes, that's correct. So when you talk about something that's derived from ZEISS data, it would be whatever the software, whatever it is, that's derived from the OCT data, for example. Right. If you take, for example, the IMG export license that they deceived ZEISS into getting. So it's a license that they deceived ZEISS into giving them secretly by deception, and then they went ahead and developed a product based on that. And so that file would also be something that was improper, that was misappropriated from ZEISS, but it happened after the injunction came out. Because remember, this is a preliminary injunction, and the district court only had limited information. It came out later from Crowell's reporting that this IMG export license had been obtained improperly by TopCon. At what point do you go back and try to change the scope of the license because new facts are discovered? I'm sorry, the scope of the license? Yeah, I'm sorry, the injunction. Sorry. Sure. Well, of course, this is a preliminary injunction. We've sought contempt on this issue of the decoder. We don't think that we need to go back and seek any reconsideration of the scope because Clause 2 is perfectly sufficient. It's sufficiently clear to TopCon what the relief is. It's anything that TopCon took from ZEISS. But again, that's a limited body of information. Well, it's not very clear to me because you're now talking about this other improper use of the license through their customers to get, or somehow to get, which doesn't even seem like it was covered at the time of this injunction. But you're now saying that's another thing. How can that be clear that this injunction was meant to cover that separate data? I'll tell you exactly why, Your Honor, because the forensic examination that the district court ordered uncovered that license. Just to be clear, we're not addressing this in any way. I mean, obviously, it's not before us. That's correct. That's exactly right. I'm still confused about what you're talking about when you're talking about I get the HFA data, or I think I do at least. Maybe I'm overconfident on that too. But when you're talking about the OCT data that they improperly obtained, are you including in that that licensing data, that later acquired licensing data? Yes. Okay. But let's set that aside. Is there OCT data that they obtained not through that but from the hard drives they took with them? Yes, Your Honor. They obtained OCT data from the hard drives. See, and is that clear from anything? Because it's not circular clear to me. Yes, it's clear on Appendix 16. If I could read from Line 12. Defendants do not dispute that Kurski transmitted those and other HFA and OCT files to persons at TopCon and to Kelsey. So OCT data is clearly within the scope. Counsel, I have one more question for you, which is, and I apologize, I might even have more, but is this list of the trade secrets that I find starting at page 80, 32, 82, is that the most comprehensive list that we have before us and that was considered by the court below? Yes, Your Honor. Yes, that list was before the court and TopCon did not challenge those trade secrets in the below briefing, did not challenge that they were sufficiently identified. And all of those trade secrets relate to HFA and OCT. I mean, this is not an unbounded list. It all relates and it's all tied to the products at issue here. But what about in Footnote 1, it says, the present disclosure is limited to Glock Home and Workplace. Yes, but also in Footnote 1, it also says that it will be, it's limited to Glock Home and Workplace, which is ZEIS's product. So ZEIS's product, Glock Home and Workplace, works with ZEIS OCT and ZEIS HFA data. So it's limited. So if you look at trade secrets 34 through 37, I'm sorry, 44, 44 through 47, it talks about OCT data. I get it. Your Glock Home and Workspace covers both the visual field analysis and the retina scanning. And their Glock Home module is only covering the HFA data. Well, to be clear, Your Honor, they intended to eventually have both HFA and OCT read ZEIS data. That's in their documents and their records. So it was an entire scheme to do both HFA and OCT. And, in fact, to do other products as well, is what TopCon was intending to do because ZEIS is the market leader in all of these products that are to diagnose and treat glaucoma. So TopCon wanted to be completely device agnostic, and they've advertised that. So the feature that they have right now is HFA, OCT, and there's other types of data as well. We'd also point that the district court also credited that the former employees had taken other types of files. And I'd read from Appendix 15 where it says, Other former employees also copied confidential information to external memory devices before leaving CZMI for TopCon. So Clause 2 covers that. Clause 2 covers what the other former employees took as well. So it's not just HFA, and it's not just glaucoma module. And Mr. Carlson talked about glaucoma modules, if that's the only product at issue, but clearly ZEIS has asked for more than just glaucoma modules. ZEIS, like I pointed to in Appendix 7, asked for a forensic examination of other files. And so we think it's plain that Clause 2 should be upheld, and that's all that we're talking about here. TopCon did not challenge the injunction. TopCon did not challenge Clause 1 of the injunction. Like Mr. Carlson, they are undergoing a forensic investigation by Kroll right now, and we're supposed to get a report next week. So how can TopCon come into this court and say we don't understand Clause 2 when they've hired Kroll and they're conducting this investigation? We don't think it's correct that they can come in and say it's nonspecific. So I didn't hear TopCon's counsel mention that last section that we talked about. You asked about the hard drive. I didn't hear him mention the other files that the other employees took, and we think that case is positive. We think it's really clear if you read Clause 2. Clause 2, the last part of Clause 2, refers to the hard drive, and it refers to the files that the employees took during the course of their employment with ZEIS. And all of their case law is about nonspecific injunctions. Clause 2 is more specific than any of the cases cited by defendants. I haven't asked you the same question I asked, which is, I mean, how would it impact you if their language, any CZMI, confidential proprietary trade secret information, including, was deleted? I mean, you'd still have protection of all the things you've just mentioned, which is any files obtained from the hard drive or during the course of former defendant's employment. Why isn't that enough to protect you? Well, we certainly like that language, which Mr. Carlson has avoided mentioning. So to answer your question, we'd be okay with that as long as it's pending the forensic examination, because what if they took a prototype of one of ZEIS's products? Would that fit within that? It's not within the hard drive, but it's part of the ongoing forensic examination. What if they took the algorithm for another product? We're still doing this forensic investigation. There's a lot of files that were taken here, 35,000 alone on the hard drive. So what if there's information that was taken by the employees that's not covered by that specific language of Clause 2? So that's why the judge said any CZMI confidential proprietary trade secret information. And we haven't mentioned here that there's a breach of contract claim that the judge found a likelihood of success on. The breach of contract as well as trade secret misappropriation. So the relief is broader in the preliminary injunction. So we would want Clause 2 to include the same language because it's specific, because it's, again, limited to the- Just to make sure I understand, you can't identify or think of anything today that wouldn't be included in this second clause, that is the any files obtained from language. But you're saying it could be. Any files obtained by, you mean beyond that? Well, it says, again, I'm asking what exists in terms of CZMI confidential proprietary or trade secret information that is outside of the language. Any files obtained from the hard drive or during the course of former defendant's employment with CZMI. That's what I'm trying to figure out. Well, there are certainly a lot of other things that we could think of. We're not required to catalog the entire universe. No, you're not. I'm just- Right. I mean, they could have taken a prototype. They could have taken an algorithm. They could have taken devices that ZEISS uses. These people worked at ZEISS for a collective amount, I think, of about 90 years, between the eight employees. They could have taken things like pricing information, product- Things that aren't files. Things that aren't files, right. They could take things that aren't files. I mean, information in the trade secret law is not limited just to physical files, right? So they could have taken printouts. It could be other things besides just files that we're still finding out in the forensic examination. Again, I refer to that license that they obtained later on. But that's because they used information that they knew from the course of their employment. They took information that they learned during the course of their employment that to decode the ZEISS data, they needed this IMG license. They took that information, so that falls under Clause 2, and then they went out and convinced some doctor to give them this license outside the scope of the doctor's agreement. So I would say that would also be an example if you wanted to say something that didn't qualify necessarily as a file, even though the IMG export license literally is a file. So we would think it's under Clause 2. But talking to that doctor and emailing him and convincing him, we would also consider that to be within Clause 2 of any CCMI information because it's confidential to know that you need to use that license to decode ZEISS's data. The contents of that license are confidential. So the IMG license is a confidential document. But that hadn't been produced at the time of the preliminary injunction. I think you've gone beyond your time. Thank you. We have your case. Thank you. Mr. Carlson, I'll give you three minutes. Thank you, Your Honor. Your Honor, I'd like to address whether or not the injunction should be limited to a hard drive as Your Honors have suggested. Here's the problem with it. We are absolutely complying with the basic plan to remove all ZEISS information from TopCon computers, leave it with the parole forensic expert, and it's out of TopCon's computers. That's happening right now. And as Mr. Ellman noted, we expect to have this parole report next week, as soon as next week. The problem is that interpreting that revised injunction that the court has proposed, that's where the problem is going to be. And the reason is because of Ellman Exhibit 4. Ellman Exhibit 4 was an email chain about OCT data for use possibly in Harmony. The alleged finding of misconduct that the court reported in pages 17 and 18, which relates to that Ellman Exhibit 4, that was a mistake. It was a fundamental misunderstanding of what she thought was going on with respect to that email chain. And so the factual finding, if there is any, is very much in question. Because the court – it's quite clear from the text of the order that the court thought that Ellman Exhibit 4 related to the HFA files that she was concerned about and the Qualcomm module she was concerned about. And so to bootstrap onto all these other allegations a supposition that OCT data is somehow tainted. That's a stretch. And that would be actually fact-finding, I believe, by this court. And the better vehicle, if the court is concerned about this, would be to remand for the district court to craft whatever remedy the district court thinks is appropriate in view of what was a concern. There was concern about Ellman Exhibit 4. And I think the better approach is to have the district court resolve that in the first instance rather than this court try to recraft an injunction to fit what is honestly a questionable set of findings by the court. Also, furthermore, the OCT data that was questioned there, that was never used in Qualcomm module. And there were no OCT data from ZEISS using Qualcomm module. Qualcomm module could not use ZEISS OCT files. It was never used. And so there is no link between OCT and the Qualcomm module that's at issue in the case. Furthermore, I see my time is running out. The IMG export license file, there was not a single finding by the district court in relation to the IMG export file. That came up later in the case. The ZEISS briefed it. The court courted not one iota to the ZEISS IMG export license theory. Okay. Thank you, Mr. Carsten. The case is submitted. Thank you.